**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

IN RE NEW YORK ROAD RUNNERS LITIGATION

Case No. 1:16-cv-00450-KBF

Hon. Katherine B. Forrest

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs, on behalf of themselves and all others similarly situated, by their undersigned attorneys, for their Consolidated Class Action Complaint against New York Road Runners, Inc. ("NYRR" or "Defendant"), allege upon personal knowledge as to themselves, and upon information and belief as to all other matters, based upon the investigation made by and through their attorneys, as follows:

**NATURE OF THE ACTION**

1.      The New York City Marathon (the "Marathon") is a 26.2-mile race through all five boroughs of New York City.  The first Marathon was staged by NYRR in 1970 and, with the single exception of 2012, has been run every year since.

2.      The Marathon helped to lead the "running boom" that was sweeping the country in the early 1970s, and it has ridden the rising popularity of running since then.  By 1980, NYRR membership exceeded 20,000 runners and, by the end of that decade, membership had soared to nearly 30,000.  Today, NYRR boasts membership of at least 200,000 runners and walkers, as well as 200,000 youth and seniors, worldwide.

3.      As the popularity of the Marathon grew, the number of runners who wished to compete in the Marathon began to far exceed the number of spots available.  To deal with excess demand, NYRR conducts a purportedly random, chance-based drawing for participation in the Marathon each year (the "Lottery").

4.      In addition to the Marathon, NYRR conducts various other races, including the annual New York City Half Marathon, in which participants run a 13.1-mile course throughout Manhattan (the "Half Marathon").  As with the Marathon, some of the coveted spots in the Half Marathon are filled by runners who enter a Lottery conducted by NYRR.[1]

5.      NYRR charges prospective runners a non-refundable fee of up to $11 to enter the Lottery each year, whereby entrants have the chance to win the right to participate in the upcoming Marathon or Half Marathon.  Between 2010 and 2015, tens of thousands of prospective runners paid consideration to NYRR to enter each Lottery, allowing NYRR to gross millions of dollars from the would-be runners.  For example, according to the Form 990 it filed with the Internal Revenue Service for the tax year ending March 31, 2014, NYRR earned approximately $73 million in total revenue.

6.      Over that same time period, however, fewer than 18% of Lottery entrants were chosen via the Lottery to run in the Marathon.  In 2014, for example, just over 9,000 of approximately 77,000 Lottery entrants for the Marathon were awarded spots in the Marathon through participation in the Lottery system.  Similarly, of more than 80,000 runners who entered the Lottery for the Marathon in 2015, only 14,326 were selected to participate in the Marathon that year.

7.      In conducting these Lotteries, NYRR has operated chance-based drawings or lotteries as defined under the laws of the State of New York, which require the presence of three elements: (1) consideration (a cost to enter); (2) a chance to win; and (3) a prize.  NYRR's Lotteries contain each of these elements.  NYRR charges prospective runners a non-refundable

---

[1] Because the purportedly random, chance-based drawings NYRR uses to fill spots in the Marathon and Half Marathon are substantially similar, the term "Lottery," as defined in paragraph 3 herein, will be used to refer to both the drawings preceding the Marathon and also the drawings preceding the Half Marathon.

fee of up to $11 to enter the Lottery, in which these individuals have the chance to win a prize –

qualification for one of the coveted spots in the Marathon or Half Marathon.

        8.      In doing so, NYRR has violated applicable New York law and has run afoul of the

public policy of the State of New York, which strongly disfavors chance-based drawings and

lotteries.  Aside from the public health and economic problems that lotteries tend to foster, at

their core, they are inherently unfair.  The institutions that run lotteries receive a guaranteed

windfall at the expense of thousands of individuals.  Accordingly, the New York State

Constitution generally proscribes lotteries and New York statutory law enables plaintiffs to

recover double damages and double costs of suit from those who illegally operate lotteries.  Even

where exceptions exist to the general prohibition against games of chance – such as those for

charitable organizations – the exceptions are rigidly regulated to prevent, *inter alia*,

commercialized gambling, participation in games of chance by criminals or other undesirable

elements, and diversion of funds from authorized purposes.

        9.      In addition to operating illegal lotteries, NYRR has engaged in deceptive acts and

practices when allocating coveted spots in the Marathon and Half Marathon.  When entering the

Lotteries, prospective runners paid consideration to NYRR, in the form of entry fees, based on

NYRR's representations that it would conduct each Lottery through equitable, fair, and honest

processes.  Because NYRR conducts illegal Lotteries, and does so in a manner that is unfair,

inequitable, and dishonest, Plaintiffs and all other members of the Lottery Class (as defined

below) have a private right of action against NYRR for damages.

## JURISDICTION AND VENUE

        10.     This Court has diversity jurisdiction over this class action pursuant to 28 U.S.C.

§1332, as amended by the Class Action Fairness Act of 2005, because the amount in controversy

exceeds $5,000,000, exclusive of interest and costs, and some members of the class are citizens of a different state than NYRR.  *See* 28 U.S.C. §1332(d)(2)(A).

11.     Plaintiff Matthew Clark ("Clark") is an adult individual who resides in Utah County, Utah.  He entered the Lotteries for the Marathon in 2011 and 2015.

12.     Plaintiff Sandra Del Guercio ("Del Guercio") is an adult individual who resides in New York County, New York.  She entered the Lottery for the Marathon in or about January 2013, and entered Lotteries for the Half Marathon in or about November 2013 and October 2014. Plaintiff Del Guercio also participated in the Marathon in 2013 by running for charity on behalf of the Children's Tumor Foundation, an "Official Charity Partner" of Defendant NYRR.

13.     Plaintiff Bill Fazekas ("Fazekas") is an adult individual who resides in Lake County, Ohio.  He entered the Lottery for the Marathon in 2015.

14.     Plaintiff Charles Konopa ("Konopa") is an adult individual who resides in Salt Lake County, Utah.  He entered the Lottery for the Marathon in 2014.

15.     Defendant NYRR is a 501(c)(3) not-for-profit corporation, incorporated in New York, and has its principal place of business located at 156 West 56th Street, 3rd Floor, New York, New York 10019.  Defendant is, therefore, a citizen of New York pursuant to 28 U.S.C. §1332(c)(1).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because the events giving rise to Plaintiffs' claims occurred in this District and because Defendant maintains its principal place of business in this District.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of the following classes and subclasses:

(a) all persons in the United States who entered a Lottery in 2010 through 2015, inclusive, for a chance of participating in the Marathon or Half Marathon, and who were damaged thereby (the "Lottery Class");

(b) all members of the Lottery Class who entered a Lottery in 2013 through 2015, inclusive (the "GBL § 349 Lottery Subclass");

(c) all persons in the United States who participated in the Marathon or Half Marathon in 2010 through 2015, inclusive, by running for charity on behalf of any one of Defendant NYRR's "Official Charity Partners," and who were damaged thereby (the "Charity Class"); and

(d) all members of the Charity Class who participated in the Marathon or Half Marathon in 2013 through 2015, inclusive (the "GBL § 349 Charity Subclass").

Excluded from the Classes are: employees and directors of the Defendant, as well as members of their immediate families; any person, firm, trust, corporation, officer, director, or other individual or entity in which Defendant has a controlling interest or which is related to or affiliated with Defendant; and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

18.    This action is properly maintainable as a class action because, *inter alia*:

(a)    The Classes are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of members of the Classes is unknown to Plaintiffs at this time and will be ascertained through appropriate discovery, Plaintiffs believe that the proposed Classes contain tens of thousands of members located throughout the United States.  Members of the Classes may be identified from records maintained by Defendant, and may be notified of the pendency of this action by mail, e-

mail, or other electronic means.

(b)     There are questions of law and fact that are common to all members of the Lottery Class including, *inter alia*, the following:

i.    whether NYRR engaged in deceptive acts or practices as defined by Section 349 of the New York General Business Law;

ii.   whether NYRR made material misrepresentations or omissions regarding the fairness of the Lottery process;

iii.  whether NYRR's misrepresentations and omissions regarding the fairness of the Lottery process induced Plaintiffs and the Lottery Class to enter into the Lotteries;

iv.   whether NYRR breached the implied covenant of good faith and fair dealing by failing to conduct a transparent and equitable Lottery process;

v.    whether NYRR conducted an illegal lottery from 2010 through 2015;

vi.   whether NYRR has ever obtained from the New York Gaming Commission an identification number allowing it to conduct a game of chance;

vii.  whether NYRR has ever obtained from the City of New York a license allowing it to conduct a game of chance;

viii. whether each Lottery conducted by NYRR netted proceeds in excess of $30,000;

ix.   whether the aggregate value of the prizes awarded under each Lottery exceeded $500,000; and

x.    whether NYRR complied with applicable New York laws in conducting the Lotteries.

(c)     There are questions of law and fact that are common to all members of the Charity Class including, *inter alia*, the following:

i.   whether NYRR engaged in deceptive acts or practices as defined by Section 349 of the New York General Business Law;

ii.  whether NYRR made material misrepresentations or omissions regarding the allocation of funds paid to or raised for Official Charity Partners;

iii. whether NYRR's misrepresentations and omissions regarding the allocation of funds paid to or raised for Official Charity Partners induced Plaintiffs and the Charity Class to run for charity; and

iv.  whether NYRR breached the implied covenant of good faith and fair dealing by failing to contribute all funds paid to or raised for Official Charity Partners to those charities.

(d)     Plaintiffs' claims are typical of the claims of the other members of the Classes and Plaintiffs do not have any interests adverse to the Classes.

(e)     Plaintiffs are adequate representatives of the Classes, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Classes.

(f)     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Classes is impracticable.  Furthermore, the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair

or impede their ability to protect their interests.

(g)     Defendant has acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

19.     NYRR is the organizer and operator of the New York City Marathon, a prestigious, 26.2-mile race through the five boroughs of New York City that is the largest marathon in the world.  In addition to numerous other races, NYRR also conducts the popular annual New York City Half Marathon, a 13.1 mile race within the borough of Manhattan.

20.     Though there are ways to qualify for the Marathon and Half Marathon other than participating in the Lotteries (*i.e.*, donating time or money to certain charities or running a qualifying time in another race), a portion of Marathon and Half Marathon runners qualify via the Lottery.

21.     NYRR provides runners with both guaranteed and non-guaranteed entry methods for the Marathon as well as the Half Marathon.

22.     For example, NYRR guarantees spots in the races to runners who: (1) are members of NYRR and have completed a specified number of NYRR-sponsored races and have volunteered for at least one other NYRR-sponsored race in the past calendar year; (2) meet specified qualifying time standards on USA Track and Field ("USATF") certified marathon or half-marathon courses; (3) raise (or pay) a certain amount of money for one of a list of NYRR "Official Charity Partners;" (4) live within the 50 states and purchase a travel package through NYRR's "National Travel Partner;" or (5) reside outside of the United States and purchase a

travel package through an official "NYRR International Travel Partner (ITP)."

23.     Alternatively, runners may enter the Lottery, which NYRR often referred to as the "Non-Guaranteed Entry Drawing" to disguise the fact that it was conducting illegal lotteries, for a chance to obtain a coveted race spot.

24.     To enter the Lottery, prospective runners are required to pay NYRR a non-refundable fee of $11 for the Marathon and $5 for the Half Marathon.

25.     Plaintiff Clark paid fees to enter the Lotteries for both the 2011 and 2015 Marathons.  He did not win either drawing.  NYRR has retained the fees that he paid to enter each Lottery.

26.     Plaintiff Del Guercio paid a fee to enter the Lottery for the 2013 Marathon.  She did not win the drawing.  NYRR retained the fee that she paid to enter the Lottery.  After Plaintiff Del Guercio did not win a spot in the 2013 Marathon via the Lottery, she paid $3,000 to the Children's Tumor Foundation, an Official Charity Partner, to participate in the 2013 Marathon.

27.     Plaintiff Del Guercio also paid fees to enter the Lotteries for both the 2014 and 2015 Half Marathons.  She did not win either drawing.  NYRR retained the fees that she paid to enter the Lotteries.

28.     Plaintiff Fazekas paid a fee to enter the Lottery for the 2015 Marathon.  He did not win the drawing.  NYRR retained the fee that Fazekas paid to enter the Lottery.

29.     Plaintiff Konopa paid a fee to enter the Lottery for the 2014 Marathon.  He did not win the drawing.  NYRR retained the fee that Konopa paid to enter the Lottery.

**NYRR Conducts Lotteries for Entry into the Marathon and Half Marathon**

30.     All members of the Lottery Class paid fees to enter each Lottery for participation

in one or more of the Marathons or Half Marathons held in 2010 through 2015, inclusive, and NYRR each year retained the fees paid by Plaintiffs and the other members of the Lottery Class.

31.     To be considered as a chance-based drawing or lottery, three elements must be present: consideration (a cost to enter), a chance to win, and a prize.  New York Penal Law §225.00(10) defines a lottery as "an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value."

32.     The Lotteries contain each of these elements.  Defendant NYRR charges prospective runners a non-refundable fee of up to $11 to enter each Lottery in which these individuals have the chance to win a prize, namely, the right of entry into the Marathon or Half Marathon.  Therefore, Defendant NYRR conducts a lottery within the meaning of the Penal Code for entry into the Marathon and Half Marathon.

33.     Even if Plaintiffs or other members of the Lottery Class had won the Lottery – and thus qualified for participation in the Marathon or Half Marathon – they, like all other qualifiers, would have been required to pay additional race-entry fees to participate in the races.  These fees have varying rates, depending upon the particular race, NYRR membership, and U.S. residency.

34.     NYRR allows only a limited number of Lottery participants to enter the Marathon and the Half Marathon through the Lottery.  For example, on information and belief, for each year from 2010 through 2015, approximately 80,000 prospective runners participated in the Lottery to run the Marathon.  Less than 18% of the runners who participated in a particular

year's Lottery, however, actually qualified via the Lottery to run in that year's Marathon.

35.     Defendant NYRR does not inform entrants in any of its Lotteries of the number of spots in the Marathon or Half Marathon that may be filled by Lottery participants until after the Lottery has closed.

36.     Throughout the Class Period, NYRR separated the Lottery entrants for both the Marathon and the Half Marathon into three distinct applicant pools: (1) "NYC-metro area" applicants (*i.e.*, residents in and within 60 miles of New York City); (2) "National" applicants (*i.e.*, United States residents outside of the NYC-metro area); and (3) "International" applicants (*i.e.*, non-U.S. residents, including individuals from Puerto Rico and other U.S. territories).

37.     While NYRR asserts that "neither the percentage nor the number of entrants ultimately selected in each of the applicant pools can be determined" until the entry deadline, it fails to disclose that not all Lottery entrants have the same chance of being selected for entry into any particular Marathon or Half Marathon.

38.     NYRR does not disclose that Lottery entrants have different chances of gaining entry into each Marathon and Half Marathon based upon where they reside.  In particular, Defendant NYRR does not disclose that the odds of being selected through the Lottery have always been significantly lower for NYC-metro area applicants than for National or International applicants, or that the odds of being selected through the Lottery have always been lower for National applicants than for International applicants.

39.     For example, the Lottery results for the 2011 Half Marathon, as announced by NYRR, were as follows:

> (a) Out of approximately 27,737 Lottery applicants from the NYC-metro area, only
>
>      3,344 (12%) were selected for participation in the 2011 Half Marathon;

(b) Out of approximately 5,200 National applicants, about 4,300 (83%) were selected for participation in the 2011 Half Marathon via the Lottery; and

(c) Out of approximately 1,710 International applicants, about 1,500 (88%) were selected for participation in the 2011 Half Marathon via the Lottery.

40.    Moreover, Defendant NYRR consistently has promoted the selection process as an entirely transparent and equitable process whereby runners are randomly selected by an electronic program.

41.    NYRR omits to state, however, that throughout the Class Period the odds of runners from the NYC-metro area being selected through the Lottery system were significantly lower than the odds of selection for other runners.  International runners were the most likely to win a spot in the Marathon or Half Marathon via the Lottery, with National runners from outside the NYC-metro area coming in at a close second.

42.    In late 2010 or early 2011, if not sooner, Mary Wittenberg, who was President and Chief Executive Director of NYRR from 2005 through 2015, was told that NYRR was not conducting fair, honest, transparent, and equitable Lotteries for entry into the Marathon and the Half Marathon.

43.    In early 2011, Defendant expressly agreed to change its policies and practices and conduct fair, honest, transparent, and equitable Lotteries for entry into the Marathon and the Half Marathon.  Nevertheless, since that time, NYRR has continued to conduct unfair, dishonest, opaque, and inequitable Lotteries and has persisted in deceiving the public about the unfair – and illegal – nature of its Lottery process.

44.    Every year from 2010 through 2015, the net proceeds or net profits of the Lottery exceeded $30,000, as defined by Section 186 of the New York General Municipal Law.

45.     Indeed, from 2010 through 2015, the Lotteries generated millions of dollars in gross revenues for Defendant.

46.     Nevertheless, for each year from 2010 through 2015, NYRR had neither an identification number from the New York Gaming Commission nor a license from the City of New York, both of which are generally required by Sections 189, 190, and 195-k of the New York General Municipal Law.

47.     For each and every year from 2010 through 2015, the aggregate value of the series of prizes awarded as a result of each Lottery, within the meaning of Section 186 of the New York General Municipal Law, exceeded $500,000.

48.     Moreover, in each and every year from 2010 through 2015, there was at least one day in which NYRR collected more than $500 in connection with its Lottery, which made each Lottery subject to the New York Penal Law.

**Even "Guaranteed" Entry to Participate is Unfair**

49.     NYRR offers guaranteed entries to runners in the Marathon and Half Marathon through its Official Charity Partner Program.  Even when individuals use "guaranteed" entry methods, NYRR conducts an unfair process for selecting runners to participate in the Marathon and Half Marathon.

50.     When runners seek guaranteed entry by running for charity, they are required to select from a list of NYRR's approved "Official Charity Partners" and must commit to paying or raising a certain amount, which is usually several thousand dollars for entry into the Marathon and usually $1,000 or more for entry into the Half Marathon.  These Official Charity Partners are separated into multiple levels, each of which provides runners with "different benefits … and perks."  The Official Charity Partners that provide runners with the most perks – "the ultimate

VIP experience" – both appear to be NYRR-run programs.

51.     NYRR demands that the Official Charity Partners share a portion of the money raised by runners seeking entry into the Marathons or Half Marathons by this method (either through their own contributions to the charities or through similar contributions the runners solicit from others).

52.     Upon information and belief, with only one exception, the Official Charity Partners must pay to NYRR at least $450 and up to $995 of all the contributions they receive from or on behalf of each entrant into the Marathons and at least $250 of all the contributions they receive from or on behalf of each entrant into the Half Marathons.

53.     A runner seeking entry into either the Marathon or Half Marathon by running for charity may raise the minimum amount for entry by paying the minimum amount herself or by soliciting contributions from others. In either event, Defendant NYRR demands at least $450 and up to $995 per entrant for each Marathon and at least $250 per entrant for each Half Marathon from the Official Charity Partners.  These guaranteed amounts are paid to NYRR in addition to the regular entry fees that the runners also must pay to it to run in the races.

54.     The sole exception to this sharing requirement is NYRR's Team for Kids ("TFK"), one of NYRR's "Official Charity Partners."  Upon information and belief, TFK is merely a fictitious name under which Defendant NYRR conducts business.  TFK appears nowhere in the database of charitable entities maintained by the Attorney General's Charities Bureau and it appears nowhere in the database of corporations licensed to conduct business in the State of New York maintained by the New York Department of State.  Therefore, NYRR receives all of the money paid to TFK through the Official Charity Partners Program.

55.     In fact, despite its purported commitment to charity, NYRR contributes only a

small fraction of its generous budget to charitable enterprises. For example, upon information and belief, in 2011 NYRR contributed only $494,000 directly to charitable enterprises, representing less than 1% of the whopping $53.8 million in revenue it earned that year. According to NYRR's tax filings, the bulk of this money – nearly $210,000 – went to support NYRR's own kids programs, while the remainder went primarily to other running organizations across the country. Meanwhile, CEO Mary Wittenberg earned a salary of $500,843 that year – nearly double the median CEO salary for non-profits the size of NYRR in the Northeast in 2011.

56.     Defendant NYRR does not disclose to runners who seek entry into the Marathons or Half Marathons by running for charity that it requires the "Official Charity Partners" other than TFK to share with it a portion of all the contributions they receive from or on behalf of entrants into each Marathon or Half Marathon. Nor does Defendant NYRR disclose to runners that TFK is merely a fictitious name through which it conducts business and, therefore, NYRR keeps all of the contributions to TFK.

57.     With regard to NYRR members who wish to qualify by completing a specified number of events, the cost of guaranteed entry into the Marathon or the Half Marathon is exceptionally high. For instance, to qualify for the Marathon through NYRR's "9+1 Program," runners must have completed at least nine scored, qualifying NYRR-sponsored races in the preceding calendar year, as well as volunteering at one NYRR event in the prior calendar year.

58.     Alternatively, through the NYRR "9+$1K Program," runners can qualify for guaranteed entry into the Marathon by completing nine qualifying NYRR-sponsored races and donating $1,000 to NYRR's Youth and Community Services programs in the prior calendar year.

59.     While the cost of each race varies, qualifying by either then 9+1 Program or the 9+$1K Program is both expensive and time-consuming, thus limiting the number of people who

can gain entry into the Marathon by these methods.

60.     The Half Marathon has a similar qualification method, whereby NYRR members must complete four of six NYRR "borough races" in the prior calendar year, again making it more difficult for those who may not have the economic means or the time to complete the required races to gain guaranteed entry into the Half Marathon in this manner.  Furthermore, runners are not eligible to participate in this program – or the 9+1 or 9+$1K programs – unless they are NYRR members.  Membership in NYRR also comes at an annual price of between $25 and $60.

## COUNT I

### (Violation of New York General Business Law § 349)

61.     Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

62.     Count I is asserted by Plaintiffs only on behalf of the GBL § 349 Lottery Subclass and the GBL § 349 Charity Subclass.

63.     New York General Business Law ("GBL") § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

64.     In its capacity as the organizer and operator of the Marathon and Half Marathon, Defendant conducted a business within the meaning of GBL § 349.

65.     In the conduct of its business, Defendant engaged in deceptive acts and practices by, *inter alia*: (i) misleading prospective runners to believe that NYRR conducted fair Lotteries when determining which Lottery entrants would be afforded spots in the Marathons and Half Marathons; (ii) failing to conduct a transparent and equitable process when selecting participants for the Marathons and Half Marathons through the Lottery process; and (iii) concealing material

16

facts about Defendant's own interest in the charitable contributions paid by or on behalf of race entrants to NYRR's "Official Charity Partners."

66.     More particularly, Defendant conducted the Lotteries unfairly and through the processes described above, without providing sufficient information to inform Lottery entrants of the differing odds of entry, as alleged above.  In addition, Defendant NYRR failed to disclose that it received a percentage of all the money contributed to "Official Charity Partners" other than TFK, and every dollar contributed to TFK itself.

67.     Defendant's unfair or deceptive acts or practices, including its concealments, omissions, and misstatements of material facts alleged above, had a tendency or capacity to mislead, tended to create a false impression in consumers, and were likely to (and did in fact) deceive reasonable consumers, including Plaintiffs and the other members of the Subclasses, about the true evenhandedness of the Lottery process.

68.     Defendant's unfair and deceptive practices, including its concealments, omissions, and misstatements of material facts alleged above, had a tendency or capacity to mislead, tended to create a false impression in consumers, and were likely to (and did in fact) deceive reasonable consumers, including Plaintiffs and the other members of the Class, about NYRR's financial interest in the contributions to "Official Charity Partners."

69.     Plaintiffs and the other members of the GBL § 349 Lottery Subclass who participated in the Lotteries suffered ascertainable losses, caused by Defendant's misrepresentations and failure to disclose material information.  Had they been aware of the inequitable nature of the Lottery process, they would have either paid less to enter into the Lotteries or would not have entered into the Lotteries at all.  Thus, Plaintiffs and the other members of the GBL § 349 Lottery Subclass did not receive the benefit of their bargains as a

17

result of Defendant's misconduct.

70.     Plaintiff Del Guercio and the other members of the GLB § 349 Charity Subclass who ran for charity suffered ascertainable losses, caused by Defendant's misrepresentations and failure to disclose material information.  A portion of the money they supposedly paid to or raised for their chosen Official Charity Partners was paid not to the particular charities, but instead to Defendant NYRR.  Thus, their charitable intentions and expectations were frustrated. Had they been aware that Defendant NYRR received a substantial percentage of the money paid to or raised for the Official Charity Partners, they would have either paid or raised less or would not have participated in the run for charity at all.  Thus, Plaintiff Del Guercio and the other members of the GBL § 349 Charity Subclass did not receive the benefit of their bargains as a result of Defendant's misconduct.

71.     As a direct and proximate result of Defendant's violations of GBL § 349, Plaintiffs and the other members of the Subclasses have suffered injury-in-fact or actual damage.

72.     Unless enjoined, Defendant NYRR will continue its deceptive conduct alleged above.

73.     Because Defendant's willful and knowing conduct caused injury to Plaintiffs and the other members of the Class, they seek recovery of their actual damages or $50 for each claim, whichever is greater, discretionary treble damages up to $1,000 for each claim, punitive damages, reasonable attorneys' fees and costs, an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under GBL § 349.

## COUNT II

### (Fraudulent Inducement)

74.     Plaintiffs repeat and reallege paragraphs 1 through 60 and 66 above as if fully set

forth herein.

75.   Count II is asserted on behalf of the Lottery Class and the Charity Class.

76.   Defendant's misrepresentations and material omissions of fact concerning the way in which it conducts its Lotteries induced Plaintiffs and the other members of the Lottery Class to enter into one or more NYRR Lotteries.

77.   Defendant's misrepresentations and material omissions of fact concerning its share of the money supposedly contributed to "Official Charity Partners" induced Plaintiffs and the other members of the Charity Class to enter one or more Marathons or Half Marathons by running for charity.

78.   Defendant knew the misrepresentations and omissions to be false and misleading and intended to induce Plaintiffs' reliance and the reliance of the other members of both the Lottery Class and the Charity Class.

79.   Plaintiffs and the other members of both the Lottery Class and the Charity Class justifiably relied on Defendant's misrepresentations and omissions, which resulted in injury to Plaintiffs and the other members of those Classes, as alleged above.

80.   Defendant NYRR acted as alleged herein in willful or reckless disregard of the rights of Plaintiffs and the other members of the Classes.  Unless enjoined, NYRR will continue to misrepresent and omit to state material facts as alleged herein.

## COUNT III

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

81.   Plaintiffs repeat and reallege paragraphs 1 through 60 above as if fully set forth herein.

82.   Count III is asserted on behalf of the Lottery Class and the Charity Class.

83.     When Plaintiffs and the other members of the Lottery Class participated in the Lotteries, they entered into contracts with Defendant, whereby NYRR made an implied promise that it would conduct its Lotteries in a fair, honest, transparent, and equitable manner.

84.     When Plaintiffs and the other members of the Charity Class agreed to run for charity, they entered into contracts with Defendant, whereby NYRR made an implied promise that it would contribute all of the money paid to or raised for their chosen Official Charity Partners to those particular charities, and failed to disclose that NYRR kept a substantial portion of these charitable contributions for itself.

85.     These implied promises are not contrary to any express provisions of the contracts between the parties.

86.     By taking the actions alleged above, Defendant acted in a manner that, although not expressly forbidden by any contractual provision, deprived Plaintiffs and the other members of both the Lottery Class and the Charity Class of their right to receive the benefit of their agreements.

87.     Defendant did not breach an express provision of its contracts with Plaintiffs and the other members of the Lottery Class by failing to conduct the Lotteries in a fair, honest, transparent, and equitable manner, but Defendant's conduct, as alleged above, breached the covenant of good faith and fair dealing implied in its contracts with Plaintiffs and all other members of the Lottery Class.

88.     Similarly, while Defendant did not breach an express provision of its contracts with Plaintiffs and the other members of the Charity Class by keeping a substantial percentage of the contributions paid to or raised for the Official Charity Partners, without disclosing this practice, Defendant's conduct, as alleged above, breached the covenant of good faith and fair

dealing implied in its contracts with Plaintiffs and all other members of the Charity Class.

89.     Plaintiffs and all other members of both the Lottery Class and the Charity Class were damaged as a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing in amounts to be determined at trial.

## COUNT IV

### (Under New York General Obligations Law § 5-423)

90.     Plaintiffs repeat and reallege paragraphs 1 through 60 above as if fully set forth herein.

91.     Count IV is asserted only on behalf of the Lottery Class.

92.     Defendant's Lotteries for entry into the Marathons and Half Marathons held from 2010 to 2015 involved consideration (the payment of a fee to enter the drawing), chance (the drawing itself), and a prize (qualification for the respective Marathon).

93.     Defendant knowingly advanced or profited from Lotteries for entry into its Marathons and Half Marathons from 2010 through 2015.

94.     Defendant's Lotteries for entry into the Marathons and Half Marathons held from 2010 to 2015 were prohibited by New York law because:

    (a) they involve consideration, chance, and a prize;

    (b) NYRR does not qualify as an "authorized organization," as defined by section 186 of the New York General Municipal Law;

    (c) the Lotteries do not qualify as a "Game of Chance," as defined by section 186 of the New York General Municipal Law;

    (d) NYRR did not have an identification number or license when conducting the Lotteries;

21

(e)  the net profits of each lottery exceeded $30,000;

(f)  for each Lottery, NYRR awarded a series of prizes that had an aggregate value in
     excess of $500,000;

(g)  for each Lottery, NYRR had at least one day on which it received more than $500
     in entry fees;

(h)  in conducting the Lotteries, NYRR knowingly advanced or profited from
     unlawful gambling activity, as that term is used in section 225.05 of the New
     York Penal Law;

(i)  in conducting the Lotteries, NYRR knowingly advanced or profited from
     unlawful gambling activity by receiving, in connection with a lottery more than
     five hundred dollars in any one day of money played in such scheme or
     enterprise; and

(j)  in conducting the Lotteries, NYRR advanced or profited from "Gambling" or a
     "Lottery," as those terms are defined in section 225.0 of the New York Penal
     Law.

95.     Defendant's Lotteries for entry into the Marathons and Half Marathons held from
2010 to 2015 were also unlawful and prohibited by the New York Penal Law because NYRR did
not have an identification number or license when conducting them and, for each Lottery, had at
least one day on which it received more than $500 in entry fees.

96.     By paying a fee to participate in Defendant's chance-based Lotteries, Plaintiffs
and the other members of the Lottery Class purchased a share, interest, ticket, certificate of any
share or interest, or part of a ticket, or any paper or instrument purporting to be a ticket or share
or interest in a ticket, or purporting to be a certificate of any share or interest in any ticket, or in

any portion of any lottery.

97.     Because the drawings for entry into the 2010 through 2015 Marathons and Half Marathons were prohibited by the New York Penal Law, under Section 5-423 of the New York General Obligations Law, Plaintiffs and each member of the Lottery Class are entitled to double the amount of the fee(s) each paid to enter the drawing(s), plus double the costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.     Determining that this action may be properly maintained as a class action and certifying Plaintiffs as the Class representatives pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding compensatory and statutory damages, in favor of Plaintiffs and the other members of the Class, for the losses and damages suffered as a result of Defendant's wrongdoing alleged  herein;

C.     Awarding actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under GBL § 349;

D.     Entering an injunction prohibiting Defendant from conducting an illegal Lottery unless and until Defendant complies with applicable New York State gaming laws;

E.     Entering an injunction requiring Defendant NYRR to remit to the Official Charity Partners all the money it has received from its Official Charity Partners for the 2010 through 2015 Marathons and Half Marathons.

F.     Entering an injunction requiring Defendant NYRR to disclose all material facts concerning the Lotteries and the Official Charity Partners Program or preventing NYRR from conducting Lotteries for entry into the Marathon and Half Marathon and from collecting a

portion of the proceeds raised through the Official Charity Partners Program.

       G.     Awarding Plaintiffs and the other members of the Class the costs and expenses of this litigation, including reasonable attorneys' fees, experts' fees, and other costs and disbursements; and

       H.     Awarding Plaintiffs and the other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: New York, New York
       March 25, 2016

                          **WOLF HALDENSTEIN ADLER
                          FREEMAN & HERZ LLP**

                  By:   /s Mark C. Rifkin      
                          Mark C. Rifkin
                          Gregory M. Nespole
                          Correy A. Kamin
                          270 Madison Avenue
                          New York, NY 10016
                          Tel.: (212) 545-4600
                          Fax:  (212) 686-0114
                          rifkin@whafh.com
                          nespole@whafh.com
                          kamin@whafh.com

                          **RANDALL S. NEWMAN PC**
                          Randall S. Newman
                          37 Wall Street, Penthouse D
                          New York, NY 10005
                          Tel: (212) 797-3737
                          Fax: (212) 797-3172
                          rsn@randallnewman.net

                          **ABBEY SPANIER, LLP**
                          Judith L. Spanier
                          Nancy Kaboolian

212 East 39th Street
New York, NY 10016
Tel: (212) 889-3700
Fax: (212) 684-5191
jspanier@abbeyspanier.com
nkaboolian@abbeyspanier.com

**CHRISTENSEN & JENSEN, P.C.**
Phillip E. Lowry
Bryson R. Brown
257 E. 200 S., Suite 1100
Salt Lake City, Utah 84111
Tel.: (801) 323-5000
Fax: (801) 355-3472
phillip.lowry@chrisjen.com
bryson.brown@chrisjen.com

*Attorneys for Plaintiffs*

/785916